15

FILED

JUL 2 3 2009

KT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re                                        Case No. 07-13741

ROBERT LLOYD BORLAND

          Debtor.
_____/

                                             Adv. No. 08-1042

RAMONA WOOD

          Plaintiff,

     vs.

ROBERT LLOYD BORLAND

          Defendant.
_____/

          **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     Trial in this adversary proceeding was held on February 11

and 12, 2009, and continued to March 18, 2009.  Closing briefs

were filed May 1, 2009, and the court then took the matter under

submission.

     This memorandum contains findings of fact and conclusions of

law required by Federal Rule of Bankruptcy Procedure 7052 and

Federal Rule of Civil Procedure 52.  This is a core proceeding as

defined in 28 U.S.C. §157(b)(2)(I).

     The adversary proceeding seeks a determination of

nondischargeability of debt under Bankruptcy Code sections

523(a)(2); 523(a)(4); and 523(a)(6).  All the evidence at trial

1

42

1   went to the claim for nondischargeability under § 523(a)(4).

2

3   Joint Statement of Undisputed Facts.

4       On March 12, 2009, plaintiff and defendant filed a Joint
5   Statement of Undisputed Facts.  Those facts are set forth below,
6   and are adopted by the court as findings of fact in this
7   adversary proceeding.

8       1.  Plaintiff met defendant while working at Frito-Lay in
9   Bakersfield, California.  Defendant was one of the individuals
10  who interviewed plaintiff for the position of Crewing
11  Coordinator.

12      2.  As a Crewing Coordinator, plaintiff worked under an
13  equal level supervisor of defendant named Marcos, who was the
14  Fritos unit supervisor.

15      3.  On or about April of 2004, defendant acquired his real
16  estate broker's license and started the real estate firm known as
17  Christian Realty.

18      4.  On or about December of that same year, Defendant quit
19  his job at Frito Lay and became the president of the start-up
20  company known as Kleenerz, Inc. ("Kleenerz").  As president of
21  Kleenerz, defendant understood his duties to do everything in his
22  power within reason to allow Kleenerz to succeed.

23      5.  Kleenerz sought financing via an SBA type bank loan and
24  found out that, due to being in existence for less than two
25  years, it would be next to impossible to get such a loan.

26      6.  On or about February 17, 2005, plaintiff engaged
27  defendant as her real estate broker to sell her residence located
28  at 11402 Garrick Ct., Bakersfield, California.

2

1    7.   Such real estate brokerage relationship was successful

2  in the sale of plaintiff's residence in approximately June 2005.

3  The proceeds of sale were approximately $300,000.

4    8.   Tim Denari, a shareholder and officer in Kleenerz, asked

5  defendant if he knew of anyone that might be interested in

6  loaning money to Kleenerz.

7    9.   Defendant placed plaintiff on a list of five people that

8  he thought could be potential investors interested in investing

9  in Kleenerz.   Such potential investors were defendant's cousin

10  Danny Aldrich, a coworker Brent Fowler, defendant's aunt and

11  uncle Dan and Elaine Aldrich, and Jeremy Jessup.

12    10.   Mr. and Mrs. Aldrich, Mr. Fowler, and Mr. Jessup

13  declined to invest in Kleenerz.

14    12.   Defendant telephoned Ms. Wood about investing in

15  Kleenerz.   The next step was a meeting among defendant, Ms. Wood

16  and Tim Denari.   Defendant does not recall what financial

17  information was provided to plaintiff.   After such meeting,

18  defendant understood that plaintiff had her money with Wells

19  Fargo Bank.

20    13.   Plaintiff loaned Kleenerz $300,000 on or about

21  September 23, 2005.   The loan was personally guaranteed by

22  defendant and by Tim Denari.   Interest payments were made as set

23  forth in the payment history admitted into evidence.

24    14.   The principal balance and accrued interest remains

25  unpaid.

26    15.   Defendant, and his wife, Mrs. Borland, subsequently

27  signed a note for $300,000 in connection with pledging deeds of

28  trust in an attempt to secure plaintiff's loan.

3

Additional Findings of Fact.

      As set forth above, the parties agree that defendant Borland acted as a real estate broker in selling plaintiff's residence. The sale resulted in proceeds of about $300,000, which plaintiff Ramona Wood placed in a Wells Fargo Account.

      In the meantime, Robert Borland had become a shareholder and officer in the start-up company called Kleenerz.  Kleenerz needed capital.  After Ramona Wood met with Robert Borland and the other officer and shareholder in Kleenerz, Tim Denari, she agreed to lend Kleenerz $300,000 and in fact did lend Kleenerz $300,000 on or about September 23, 2005.  Kleenerz made some interest payments but ultimately the business failed.  Both Kleenerz and Robert Borland filed bankruptcy.  Borland and Denari had guaranteed the loan.  Also, Borland and his wife had signed a second note for $300,000 to Wood and secured that note with deeds of trust.  This was done after the initial loan.

      Wood and Borland had worked together at Frito-Lay.  They knew each other as casual work acquaintances.  However, when Wood decided to sell her house, she selected Borland as a real estate broker because she had known about him through Frito-Lay. Borland did not receive a commission on the loan made to Kleenerz.

      Wood looked up to Borland and Denari. She thought they were responsible people.  She was interested in the loan to Kleenerz because they told her they would give her 9% interest, which was better than the 3% she was getting at Wells Fargo.  Initially, no collateral was offered or requested.  Wood was interested in getting a better return on her $300,000 because she wanted to

4

1 | stay home with her child.

2 | The testimony was inconclusive about whether Borland told
3 | Denari that Wood had $300,00 to invest before he obtained Wood's
4 | permission to make this disclosure.

5 | When Wood, Denari, and Borland met, Denari explained to Wood
6 | how the Kleenerz business operated.  Denari also gave her a
7 | personal guarantee, which was the only one he executed for any of
8 | the loans to Kleenerz.  No documents about the financial
9 | condition of Kleenerz were given to Wood.  However, Denari did
10 | discuss the risk of the investment with Wood.  He explained to
11 | her that the cleaning business was subject to seasonal factors;
12 | that competitors were an issue; and that there were financing
13 | issues.  He testified that he ran through the basic business
14 | risks with her.  He also discussed with her the risk of entering
15 | into an unsecured loan and how unsecured lending works.  No
16 | disclosures were made in writing to her.

17 | Wood was interested in lending money to Kleenerz, not in
18 | being an investor in Kleenerz for an equity share.  She was
19 | interested in obtaining regular interest payments.

20 | Kleenerz had a business plan and initially did well.  A
21 | number of people in the Bakersfield area invested in Kleenerz.
22 | Both Denari and Borland themselves invested substantial sums in
23 | Kleenerz.  After Wood invested, Kleenerz continued to grow.
24 | Subsequently, a problem arose that caused Kleenerz to file its
25 | own bankruptcy case.

26 | About three to six months after Wood lent Kleenerz $300,000,
27 | she became an employee of the company.  Eventually she said to
28 | Borland that she didn't need the interest payment each month, and

5

1 | asked them to hold the interest payment.

2 | Three years after the loan, Borland gave Wood deeds of trust
3 | on his rental properties.  He did this because in his mind the
4 | rental property equity was her "failsafe."  Borland caused a
5 | proof of claim to be filed for Wood in the Kleenerz chapter 11
6 | case.

7 | Borland believes that Wood lent the $300,000 to Kleenerz in
8 | part because she trusted him through their friendship and not
9 | specifically because he had been the real estate broker for the
10 | sale of her house.

11 | Judgment on 11 U.S.C. sections 523(a)(2) and (1)(6).

12 | As no evidence was introduced about whether the obligation
13 | is nondischargeable under § 523(a)(2) or § 523(a)(6), judgment on
14 | those claims will be issued for defendant.

15 | Conclusions of Law.

16 | 11 USC 523(a)(4)

17 | Under 11 USC 523(a)(4), a debt is not discharged if the debt
18 | is "for fraud or defalcation while acting in a fiduciary
19 | capacity, embezzlement or larceny."  In this case, there is no
20 | question of embezzlement.  "Fraud" for purposes of
21 | § 523(a)(4)requires intentional deceit, rather than implied or
22 | constructive fraud.  4 Collier on Bankruptcy ¶ 523.17 (15ᵗʰ Ed.
23 | 2009).  "Defalcation refers to a failure to produce funds
24 | entrusted to a fiduciary and applies to conduct that does not
25 | necessarily reach the level of fraud, embezzlement, or
26 | misappropriation."  Id.  In the Ninth Circuit, an individual may
27 | be liable for defalcation without having the intent to defraud.
28 | In re Lewis, 97 F.3d 1182, 1187(9ᵗʰ Cir. 1996).

6

1    The Ninth Circuit has also set forth three requirements for

2 a debt to be nondischargeable under § 523(a)(4).

3    "A debt is nondischargeable under 11 U.S.C. § 523(a)(4)
     where 1) an express trust existed, 2) the debt was caused by
4    fraud or defalcation, and 3) the debtor acted as a fiduciary
     to the creditor at the time the debt was created."
5

6 *In re Niles*, 106 F.3d 1456, 1459 (9ᵗʰ Cir. 1997)(citation and

7 internal quotations omitted).

8    Once the creditor establishes that a fiduciary duty exists,

9 the debtor has the burden to explain the transaction.  Id. at

10 1461.

11    A debtor is only a fiduciary for purposes of § 523(a)(4)

12 where state law imposes an express or statutory trust on the

13 funds at issue.  Id. at 1463, *In re Lewis, supra,* at 1185.

14    A real estate agent can be a fiduciary for purposes of

15 § 523(a)(4).  In *In re Niles, supra,* at 1459.  Niles was a broker

16 and property manager who collected rents and purchased and sold

17 property at the direction of Otto, an investor. Niles borrowed

18 money from the collected rents, and later filed a chapter 7

19 petition. Otto filed an adversary proceeding under § 523(a)(4),

20 alleging defalcation. The court concluded that Niles was a

21 fiduciary within the meaning of 523(a)(4).  Niles collected rents

22 for the Ottos in her capacity as a licensed real estate broker.

23 She was required either to pay the funds directly to the Ottos or

24 to hold them in a trust fund account in accordance with her

25 instructions from the Ottos.  Thus, she was the trustee of an

26 express trust.  *Id.*  The court observed that the law imposes on a

27 real estate agent the same obligation of undivided service and

28 loyalty that it imposes on a trustee in favor of his beneficiary.

7

1 | *Id.*   Thus, the fiduciary relationship arose from an express or
2 | technical trust that was imposed before and without reference to
3 | the wrong doing that caused the debt." *Id.* (citations and
4 | internal quotations omitted).

5 | In *In re Woosley*, 117 B.R. 524 (9th Cir. BAP 1990), the
6 | court concluded that real estate agents licensed in California
7 | were fiduciaries under § 523(a)(4) as a matter of law, with
8 | respect to carrying out licensed activities.   In that case, an
9 | unsophisticated creditor loaned money to a real estate agent's
10 | partnership at the behest of the agent. The creditor and agent
11 | engaged in several transactions that involved the creditor
12 | lending the agent's partnership money in exchange for security
13 | interests, and exchanging security interests in certain pieces of
14 | real property for other security interests.   Consequently, the
15 | court held that the agent was a fiduciary.   The court held that
16 | the debtor was acting in his licensed capacity as construed under
17 | California law and, as such, he was a fiduciary under California
18 | law.   Id. at 530.

19 | Another relevant case is *In re Hooper*, 112 B.R. 1009 (9th
20 | Cir. BAP 1990).   In that case, an investor lent $100,000.00 to a
21 | real estate agent, which the agent invested in a real estate
22 | development project. In partial consideration for the loan, the
23 | agent agreed to counsel the investor regarding her marriage
24 | dissolution.   The facts do not state whether the investor
25 | received a security interest in return for the investment. The
26 | bankruptcy court held that the facts were insufficient to create
27 | a fiduciary duty.

28 | The Appellate Panel stated that it did not believe the lower

8

1 | court had committed clear error.

2 | "Even if the requisite trust relationship can arise solely
3 | by virtue of a broker-client relationship, although there is
  | evidence that Hooper acted as a real estate broker in
4 | assisting Schieber in the sale or purchase of real property,
  | there is no evidence that Hooper acted as Scheiber's real
5 | estate broker with respect to the transactions giving rise
  | to the debt at issue.  Rather, the evidence indicates that
6 | Hooper counseled Schieber with respect to certain investment
  | decisions and induced Schieber to loan money to him or his
7 | company.  Hooper's actions in borrowing money from Schieber
  | do not fall within the scope of the acts of a real estate
8 | broker as defined by Cal. Bus. & Prof. Code § 10131. . . .
  | The mere fact that Schieber may have employed Hooper to
9 | counsel her with respect to investment matters is not
  | sufficient to create the requisite fiduciary capacity under
10 | the narrow standard discussed above."

11 | Id. at 1013-1014.

12 | Even where a real estate agent is a fiduciary, the agent's

13 | misconduct must be in the context of the agent's licensed

14 | capacity for the debt to be nondischargeable.  Bankruptcy courts

15 | have been willing to treat real estate brokers as fiduciaries

16 | when they perform tasks within the scope of their agency.  Courts

17 | have only found debts nondischargeable pursuant to § 523(a)(4)

18 | when the loss is related to tasks that the agent performed that

19 | are typical of a real estate broker.  Thus, subsequent

20 | transactions between a broker and client will not support a

21 | nondischargeability claim unless the broker was acting in his or

22 | her capacity as a broker during the transaction that gave rise to

23 | the debt.

24 | Admissibility of Expert Witness Testimony.

25 | In this case, both plaintiff and defendant called expert

26 | witnesses about the scope of a real estate broker's fiduciary

27 | duties.  Neither party objected to the admission of such

28 | evidence. The court asked the parties to brief whether such

9

1  testimony should be admissible in their closing briefs.  Not
2  surprisingly, both parties argue in their closing statements that
3  such testimony is admissible.  Whether such testimony is
4  admissible depends on whether the testimony is about ultimate
5  issues of fact or issues of law.

6       Federal Rules of Evidence 702 and 704 authorize expert
7  witnesses to testify about ultimate issues of fact.  Rule 702
8  provides that:

9       "If scientific, technical, or other specialized knowledge
10      will assist the trier of fact to understand the evidence or
         to determine a fact in issue, a witness qualified as an
         expert by knowledge, skill, experience, training, or
11      education, may testify thereto in the form of an opinion or
         otherwise, if (1) the testimony is based upon sufficient
12      facts or data; (2) the testimony is the product of reliable
         principles and methods; and (3) the witness has applied the
13      principles and methods reliably to the facts of the case."

14      Federal Rule of Evidence 704 states:

15      "Except as provided in subdivision (b) [addressing mental
         condition in a criminal matter], testimony in the form of an
16      opinion or inference otherwise admissible is not
         objectionable because it embraces an ultimate issue to be
17      decided by the trier of fact."

18      Of course, expert testimony on issues of law is not
19  admissible because an issue of law is to be determined by the
20  court.   See *In re Haberern v. Kaupp Vascular Surgeons*, 812 F.
21  Supp. 1376 (E.D. Pa. 1992).  In that case, a former employee sued
22  her employer, alleging breach of fiduciary duties under ERISA.
23  One of the employee's claims was that the employer's requirement
24  that employees sign a general release before receiving pension
25  benefits was arbitrary and capricious. The employer sought to
26  have a labor attorney testify that such a practice was
27  reasonable. The court stated that the Federal Rules of Evidence
28  allow testimony on ultimate issues of fact, but not law.

The testimony from Greg Hanvey, plaintiff's expert witness, and from Temmy Walker, defendant's expert witness, was consistent.  Both testified that real estate brokers have a fiduciary duty to their clients.  Walker testified that a real estate broker owes the same duty as does a trustee.  This duty includes full disclosure to the client if the broker is going to use confidential information to his or her advantage.  The duty to keep information confidential provides survives the agency. Walker also testified that other than the duty of nondisclosure, the fiduciary duty ends when the agency ends.

Wood and Borland entered into a written agreement for sale of her house.  The agreement states that the agent has a fiduciary duty to seller "of utmost care, integrity, honesty, and loyalty in dealing with the Seller."[1]

Additionally, the expert witnesses testified about the standards of practice of the National Association of Realtors. Standard of Practice 1-9 states:

> "The obligation of REALTORS to preserve confidential information (as defined by state law) provided by their clients in the course of any agency relationship or non-agency relationship recognized by law continues after termination of agency relationships or any non-agency relationships recognized by law."[2]

According to Standard of Practice 1.9, realtors shall not during or following the termination of a professional

---

[1]Disclosure regarding real estate agency relationships, admitted as Exhibit 9.

[2]Exhibit 11.

11

1  relationship with a client, reveal confidential information of
2  the client without permission.  Realtors are also prohibited from
3  using confidential information of clients for the advantage of
4  the realtor or the advantage of third parties unless the client
5  consents after full disclosure.

6      Generally, it was this obligation under Standard of Practice
7  1-9 to which the two expert witnesses testified.  The Code of
8  Ethics is admissible as evidence of the standard of care of
9  members of the real estate industry.  Miller & Starr, 3 Cal. Real
10 Estate § 3:26 at p. 130 (3rd ed. 2000).

11     Borland agreed that as a realtor estate broker he had a
12 fiduciary obligation to Wood.  It was his understanding that
13 except for the duty not to disclose confidential information,
14 that fiduciary duty terminated when the agency relationship
15 terminated.  Borland was a member of the Bakersfield and the
16 National Associations of Realtors.  Thus, the Code of Ethics was
17 applicable to him.

18     That real estate brokers in California have a fiduciary duty
19 to their clients is an issue of law.  Whether specific acts taken
20 by the broker violate that duty is a matter of fact.  The
21 testimony of both expert witnesses focused on the existence of
22 the duty and its extent.  To the extent that testimony explicates
23 an issue of law, the court will not consider it.  To the extent
24 it goes to facts, the court has considered it.  Neither party
25 objected to the admission of the testimony.
26 Conclusion.

27     At the time Borland solicited the loan from Wood for
28 Kleenerz, their real estate agency relationship had terminated.

12

However, his duty of nondisclosure continued.  If he had told
Denari about Wood's $300,000 prior to obtaining permission from
her to do so, that would have violated his duty of nondisclosure.

The evidence on this point conflicts.  At his deposition,
Borland testified that he did tell Denari that Wood had $300,000.
At trial, he testified the opposite.

However, Wood's damages, if any, did not result from any
disclosure by Borland.  Rather, they resulted from her making a
loan to a business that ultimately failed and was unable to repay
her.

To be nondischargeable under § 523(a)(4), it is not enough
that the debtor be acting in a fiduciary capacity.  Additionally,
the debt must be for "fraud or defalcation."  As set forth above,
fraud in this context requires intentional deceit.  There is no
evidence that Borland intended to deceive Wood.  In fact, all the
evidence is that Borland was an officer and 50% shareholder in a
start-up business that he very much wished to succeed.    If
things had gone otherwise, Wood would have been paid in full.
Further, not only was there no intentional deceit, at the time
the loan was made, Borland was not any longer in a fiduciary
relationship with Wood.

Defalcation refers to a failure to produce funds entrusted
to a fiduciary and applies to conduct that does not necessarily
reach the level of fraud, embezzlement, or misappropriation.
Because the fiduciary relationship between the parties had
terminated by the time Wood made the loan, the only possible way
the court could find defalcation is if it was in connection with
the continuing fiduciary obligation not to disclose confidential

13

information.

First, the court finds most credible Borland's testimony at trial that he did not disclose Wood's $300,000 to Denari before they met.  Second, even if Borland did disclose to Denari that Wood had $300,000 she might be willing to invest in Kleenerz, without receiving her permission to make that disclosure, the court does not find, on these facts, that such disclosure and the subsequent investment were a "defalcation" so as to make the obligation nondischargeable under § 523(a)(4).

From the testimony, the court is persuaded that Wood made the loan because she wanted to earn a higher interest rate so she could stay home with her child.  She listened to Denari and Borland describe the business to her. There has been no suggestion that she was misled in any manner.  Her damages resulted from Kleenerz's failing, not from any disclosure of confidential information without her permission.  Even if Borland did disclose confidential information without her permission (and the court finds he did not), such disclosure did not lead directly to - was not the cause of - her making the loan.

For the foregoing reasons, judgment will be entered for defendant on the claim under § 523(a)(4), as well as the other claims for relief.

Counsel for defendant may submit an appropriate form of judgment.

DATED: July 23, 2009

WHITNEY RIMEL, Judge
United States Bankruptcy Court

14

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA    )
                       )  ss.
COUNTY OF FRESNO       )

   I am a citizen of the United States and a resident of the
county aforesaid; I am over the age of eighteen years and not a
party to the within above-entitled action; my business address is
2656 U.S. Courthouse, 1130 O Street, Fresno, California, 93721.
On July 23 2009, I served the within document on the interested
parties in said action by placing a true copy thereof enclosed in
a sealed envelope with postage thereon fully prepaid, in the
United States mail at Fresno, California, addressed as follows:

Leo Mark Hinds, Esq.
1920 20th Street
Bakersfield, CA 93301

Robert S. Williams, Esq.
1300 18th Street, #B
Bakersfield, CA 93301

D. Max Gardner, Esq.
1800 30th Street, 4th Floor
Bakersfield, CA 93301-5298

   I certify (or declare), under penalty of perjury, that the
foregoing is true and correct.  Executed on July 23, 2009, at
Fresno, California.

_____
Kathy Torres, PLS

15